**Juan C. Chavez**, OSB #136428
**Alex Meggitt**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Of Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| ALICIA JOHNSON, in her personal capacity and as personal representative of the Estate of Terrell Johnson, TERRELL JOHNSON, deceased,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF PORTLAND; SAMSON AJIR; and JOHN DOES 1-5.<br><br>    Defendants. | Case No.<br><br>COMPLAINT<br><br>Civil Rights Action (42 U.S.C. § 1983); Wrongful Death and Battery (State Tort)<br><br>JURY TRIAL DEMANDED |

This is a civil rights and state tort law action against the above-named parties for the shooting death of Mr. Terrell Johnson, Plaintiff Alicia Johnson's son. Officer Samson Ajir violated police directives, and common sense, by engaging in a dangerous foot chase upon entry upon a scene where Mr. Johnson was in a mental health crisis. Officer Ajir needlessly shot Mr. Johnson three times. Defendant City of Portland has demonstrated that they exercise a pattern and practice of failing to train officers to follow police directives and to not use excessive force in detaining

persons undergoing recognizable mental health crises and persons experiencing houselessness, and maintain a pattern and practice of failing to properly investigate, monitor, and discipline officers for these violations. Had Defendants not violated Mr. Johnson's rights, he would be alive today.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4). The court has supplemental jurisdiction over the State tort claims pursuant to 28 U.S. Code § 1367(a).

## VENUE

2. Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and all defendants reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Alicia Johnson, Plaintiff, is a citizen of the State of Oregon, the decedent's mother, and is in the process of becoming his estate's personal representative.

4. Terrell Johnson died intestate. He lived to be 24 years old. At the time of his death, he had been living in and around the Portland area.

5. Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau.

6. Defendant Samson Ajir is a sergeant with the Portland Police Bureau (hereinafter, "PPB").

7. Plaintiff does not know the names of Defendants John Does 1-5, and thus sues them under fictitious names. John Does 1-5 are any City employees who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Plaintiff's deprivation of civil rights as hereinafter alleged.

## FACTUAL ALLEGATIONS

8. Mr. Johnson was a 24 year-old bi-racial man living in Portland metro area. In the time months leading up to the early-evening of May 10, 2017, Mr. Johnson had been undergoing some form of a mental health crisis. He sought help from medical professionals, but received none. In one instance, Mr. Johnson had tried to get drug treatment, but was told to he had to get mental health treatment first. When Mr. Johnson had sought help at a mental health clinic, he was kicked out for drawing on a chair.

9. On May 10, 2017, Mr. Johnson was laying down on a patch of grass by the Flavel MAX Station. He encountered three people on the MAX Platform and asked them for a drag of their shared cigarette. They refused. Mr. Johnson went back to his to patch of grass to lay down. One of the three people whom Mr. Johnson had asked for a cigarette, Mr. Leiker, began to walk to his nearby apartment. For reasons unknown, Mr. Johnson chased after Mr. Leiker.

10. Witnesses described Mr. Johnson running towards Mr. Leiker, not screaming or brandishing any weapon. At some point, Mr. Johnson stopped chasing Mr. Leiker, and returned to stand by a fence by the MAX platform.

11. By this time, Mr. Leiker's friend, Meredith Rivera, who was still on the MAX platform, had called 911. In her call, Ms. Rivera did not allege that Mr. Johnson had a knife or was actively engaging in a chase, only that he was now standing by a fence. In her call, Ms. Rivera

stated that Mr. Johnson was "crazy," and described Mr. Johnson as "homeless." Ms. Rivera left the MAX platform, stating that she needed to go to a concert.

12. Meanwhile, Mr. Leiker ran home to his apartment, got his father, found a kitchen knife, and returned to confront Mr. Johnson back at the MAX station. Mr. Leiker, along with his father and another bystander, cornered Mr. Johnson with the kitchen knife. Mr. Johnson allegedly brandished a hand-sized box cutter; however, only Mr. Leiker alleged this fact. Other eyewitnesses only saw Mr. Leiker holding a knife, a fact Mr. Leiker neglected to tell investigators after the incident.

13. Mr. Leiker's father demanded to know why Mr. Johnson had chased his son. Mr. Johnson allegedly said, "Because he was looking at me funny."

14. Officer Howell of the West Linn Police Department and assigned to the Transit Division arrived around 7:10 pm. Mr. Leiker and his associates fled when Officer Howell arrived. Officer Howell approached Mr. Johnson, who matched Ms. Rivera's description.

15. Officer Howell told Mr. Johnson that there was call saying that he was threatening people. Mr. Johnson said he wasn't. Officer Howell asked Mr. Johnson to sit down, but Mr. Johnson did not. Mr. Johnson did not say much. Officer Howell asked Mr. Johnson whether he had any weapons. Mr. Johnson allegedly stated that he had one in his pocket. Officer Howell told him, "That's fine. Just don't reach for it." Mr. Johnson kept his hands away from his pocket.

16. Defendant Samson Ajir of the Portland Police Bureau and assigned to the Transit Division had also received the call about Mr. Johnson. Defendant Ajir was patrolling with his brother, a Clackamas County Sheriff Deputy named Ali Ajir, also assigned to the Transit Division. The audio call did not indicate whether Mr. Johnson had a knife, but the Computer Assisted Dispatch ("CAD"), which Officers review when answering calls, indicated "NOW

WEAPS." The Brothers Ajir arrived at the Flavel MAX station approximately one minute after Officer Howell.

17. Officer Howell asked Mr. Johnson if he could pat him down. Mr. Johnson allegedly refused. Mr. Johnson continued to stand in silence, not moving. Officer Howell did not feel the urgency to detain Mr. Johnson. Officer Howell believed there were additional witnesses on the MAX platform he could talk to and get a better sense of what had occurred.

18. When Defendant Ajir and his brother arrived, Defendant Ajir saw Officer Howell speaking with Mr. Johnson. Assuming that they were detaining Mr. Ajir, Defendant Ajir began to put on gloves. Mr. Johnson could see over Officer Howell's shoulder that Defendant Ajir putting on gloves. Mr. Johnson ran away.

19. The Portland Police Bureau promulgates policies, or "directives," for its officers to follow, and gives notice to the public of these directives on their website. These directives define when and how officers can use force. Officers are to "place[] a high value on resolving confrontations, when practical, with less force than the maximum that may be allowed by law." PPB Directive 1010.00 Policy 8. The Directives further demand that their officers "recognize that their approach to confrontations may influence whether force becomes necessary and the extent to which force must be used." *Id.* at 1010.00.2.2.1.

20. PPB's directives also prohibit officers from engaging in "biased-based policing." *See* PPB Directive 0344.05. Particularly, an officer is "prohibited from taking or not taking any police-action motivated by bias or profiling." *Id.* at Policy 4.

21. PPB's directives also inform Bureau members that they "are expected to recognize signs and symptoms that may suggest a mental illness as well as behaviors that are indicative of mental health crisis." Directive 850.20 Policy 3. Officer are to "de-escalate" in such circumstances "to

maximize the likelihood of a safe outcome for members, individuals, and the community." *Id.* Officers are to "[d]isengage with a plan to resolve later… to reduce undue safety risk to the member, the involved persons, or others." Directive 850.20.2.1.3.4.

22. When PPB officers engage in foot pursuits, PPB's directives strictly proscribe the manner in which these should be conducted. According to studies, foot pursuits have been found to be more likely to involve police shootings, use of force, and injuries for both civilians and officers.

23. PPB Directive 630.15 provides that "[o]nce the foot pursuit has been initiated, the pursuing sworn member should notify BOEC and attempt to broadcast the following information:

>  1. The suspect's direction of travel.
>
>  2. Whether the suspect is armed, if known.
>
>  3. Number of fleeing suspects.
>
>  4. The reason for the pursuit.
>
>  5. If known, the identification of the suspect, or a physical description.
>
>  > b. Generally, the pursuing sworn member should not attempt to overtake the fleeing suspect but keep the suspect in sight until sufficient cover is available to take him/her into custody."

24. The Directives provide the following as techniques to consider:

>  "1. Following and maintaining a safe distance.
>
>  2. Paralleling the suspect.
>
>  3. Cover/contact pursuits (two sworn members).
>
>  4. Following a different route then the suspect (i.e., wide corners).

> 5. Using Available cover (i.e., parked cars)…
>
>> c. The primary sworn member should attempt to immediately coordinate with secondary sworn members to establish a perimeter in the area to contain the suspect. Secondary sworn members may assist with the coordination if the primary sworn member is unable to do so."

25. The directives restrict the following conduct: "should not engage in or continue foot pursuits in the following circumstances: 1. Armed suspects unless, in extreme circumstances, no other alternative strategy is feasible and a delay in the apprehension of the suspect would present a threat of death or serious physical injury to others."

26. Defendant Ajir disregarded or inappropriately minimized each and every one of these directives, and chased after Mr. Johnson. Critically, Defendant Ajir did not radio BOEC, use cover or back up, maintain a safe distance, and attempted to overtake Mr. Johnson.

27. Defendant Ajir's plan was to outrun Mr. Johnson to "tire him out." Defendant Ajir maintained a close distance to Mr. Johnson. Officer Howell and Deputy Ajir were 60 to 70 feet away from Defendant Ajir, ultimately losing sight of both of them.

28. Defendant Ajir followed Mr. Johnson as he circled back onto the MAX tracks, just North of SE Flavel Street. Mr. Johnson ran onto the train bridge over Johnson Creek. Ahead of Mr. Johnson was more tracks, fencing on both sides, and the I-205 freeway to the East. Mr. Johnson jumped over the southbound tracks and onto the center median, Defendant Ajir mere feet behind him. Defendant Ajir jumped over the tracks, and onto the center median with Mr. Johnson, who had either turned around or stopped running.

29.     Mr. Johnson allegedly had a box cutter, with a one-inch blade extended. Defendant Ajir drew his handgun and began to step backwards. While stepping backwards, a dangerous tactic when an officer is clearly unaware of their surroundings or their attention is diverted, Defendant Ajir tripped on a concrete curb, and fired his pistol four times, striking Mr. Johnson three times.

30.     One bullet struck Mr. Johnson in the back and travelled slightly upwards, from the right to left of his body. This bullet broke a rib, and perforated his right chest muscles, tissues, another rib, and right lung, finally resting in the fat tissue of his left lung. This is likely the bullet that killed Mr. Johnson.

31.     Another bullet went into Mr. Johnson's right buttock, travelling back to front in an upward trajectory, from right to left of his body. This perforated muscles, his right groin, and his abdominal walls, where it rested.

32.     The third bullet passed obliquely across his front chest area, passing left to right and front to back, guttering his chest and perforating his bicep and fracturing his humerus, where the bullet rested.

33.      Mr. Johnson fell to the ground at almost the exact moment as Defendant Ajir. Mr. Johnson fell on his chest. In his grand jury testimony, Defendant Ajir stated that Mr. Johnson had waived a knife over his fallen body, but video evidence clearly refutes this. Defendant Ajir maintains that he had intended to shoot Mr. Johnson, and this was not an accidental fire.

34.     While testifying at grand jury, PPB Sergeant Derrick Foxworth stated that Defendant Ajir's use of force was "in policy." Later training and commander review documents also found the use of force justified. These PPB commanders and trainers ignored the clear violations of PPB directives—particular in regards to foot pursuits of potentially armed suspects—in making

these findings. Defendant Ajir was allowed forty-four (44) days to not testify to detectives with the Bureau.

35. Defendant Ajir was not disciplined by his supervisors, nor was he charged with an offense. Last month, in April 2019, he was promoted to Sergeant.

36. Plaintiff Johnson lost her son.

37. Defendant City of Portland has a history of failing to train and discipline officers who shoot and kill people. In 2012, the United States Department of Justice published a letter concluding that the City of Portland that Portland Police "too frequently" used a higher level of force than necessary on individuals suffering from actual or perceived mental illness. Particularly, they found that PPB engaged in a pattern and practice of unconstitutional excessive force against community members and identified deficiencies in the City's use of force policies, practices, training, and officer accountability. The United States sued the City of Portland, which resulted in a settlement agreement whose Court oversight continues to this day. Since entering into this settlement, thirteen people undergoing a mental health crisis have been killed by Portland Police officers.[1]

38. In addition to having a history of excessive force against persons with mental illness, PPB engages in a pattern and practice of over-policing houseless people. In 2017, the year in which Mr. Johnson was killed, 52% of arrests made in Portland were of people experiencing houselessness, despite representing approximately 3% of Portland's population.[2] Eighty-six percent (86%) of these arrests were for non-violent crimes.

---

[1] Mental Health Alliance of Portland, The killing of John Elifritz by Portland police officers (April 10, 2018) available at http://www.mentalhealthportland.org/what-happened-to-john-elifritz/
[2] Rebecca Woolington, Melissa Lewis, Portland homeless accounted for majority of police arrests in 2017, analysis finds, The Oregonian (June 27, 2018), available at https://www.oregonlive.com/portland/2018/06/portland_homeless_accounted_fo.html

**Claim 1: Fourth Amendment – Unlawful Use of Force – Individual Liability**
**(42 U.S.C. § 1983)**

39. Plaintiff re-alleges and incorporates Paragraphs 1 through 38.

40. It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive, unreasonable, and unnecessary.

41. In taking the actions described above, including but not limited to engaging in a foot pursuit in direct contradiction to PPB directives, in not radioing BOEC, not utilizing cover or back up, not maintaining a safe distance from Mr. Johnson, in attempting to overtake Mr. Johnson, in stepping backwards after getting too close to Mr. Johnson to use less-lethal weapons, in unreasonably believing Mr. Johnson was giving up, in ignoring the availability of alternative methods to take the plaintiff into custody as outlined by PPB directives, by failing to deescalate a circumstance where Mr. Johnson was clearly demonstrating signs of mental illness and distress, by creating the very circumstance that lead to his firing of three bullets into Mr. Johnson, and in relying on a gun when only faced with a boxcutter, Defendant Ajir intentionally violated Mr. Johnson's right to be free from excessive force, guaranteed by the Fourth Amendment to the United States Constitution.

42. The actions of Defendant Ajir, as described in this complaint, were embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Mr. Johnson. As a result of said intentional conduct, Mr. Johnson is entitled to punitive damages against Defendant Ajir, in his individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

43. The unreasonable seizure of Mr. Johnson was the direct and proximate cause of his death, bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, expenses, worry,

fear, anguish, shock, anxiety, and nervousness. The unreasonable seizure of Mr. Johnson was also the direct and proximate cause of Ms. Alicia Johnson's emotional suffering, worry, anxiety, shock, and loss of companionship. Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

### Claim 2: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability
### (42 U.S.C. § 1983)

44. Ms. Price restates and incorporates here the allegations in paragraphs 1 through 43.

45. As described in Claim 1, Defendant Ajir violated Mr. Johnson's constitutional right to be free from unconstitutional excessive force.

46. Defendant Ajir's conduct is illustrative of a pattern and practice of PPB officers violating the Fourth Amendment rights individuals experiencing mental illness and houselessness.

47. Defendant City of Portland does not have adequate supervisory review of incidents where officers use force that would correct patterns of excessive force in a timely fashion, and rarely categorizes excessive force as out of policy even when the force is clearly excessive, as found by the United States Department of Justice, who released the findings from their investigation of the Portland Police Bureau in September 2012. Defendant Ajir received no training or discipline for violating clearly established Portland Police directives in place to prevent dangerous situations created by foot pursuits. Defendant City of Portland has effectively condoned this practice by repeatedly failing to correct it.

48. Defendants City of Portland and John Does 1-5 failed to train and discipline its officers, including Defendant Ajir, in following directives, as described above. As a result, Defendant Ajir engaged in an unreasonable foot pursuit which lead to an unreasonable use of force, killing Mr. Johnson.

49. The unreasonable seizure of Mr. Johnson was the direct and proximate cause of his death, bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, expenses, worry, fear, anguish, shock, anxiety, and nervousness. The unreasonable seizure of Mr. Johnson was also the direct and proximate cause of Ms. Alicia Johnson's emotional suffering, worry, anxiety, shock, and loss of companionship. Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

### Claim 3: 14th Amendment – Interference with Familial Relationship – Individual Liability (42 U.S.C. § 1983)

50. Plaintiff realleges paragraphs 1 through 49.

51. As alleged above, Defendants violated Mr. Johnson's rights under the Fourth Amendment, resulting in his death.

52. The alleged conduct of breaking clearly written directives to shoot to death a houseless-appearing man with mental illness shocks the conscience of the community, violating Plaintiff Alicia Johnson's rights protected under the Fourteenth Amendment's due process clause.

53. Because of this violation, Ms. Johnson has been deprived of her son's love, assurances, comfort, companionship, and relentless optimism.

54. This violation of Ms. Johnson's rights was the direct and proximate cause of her emotional suffering, worry, anxiety, shock, and loss of companionship. Plaintiff Alicia Johnson is entitled to all of their damages in an amount to be ascertained according to proof at trial.

### Claim 4: State Torts

**Count 1: Battery**

55. Plaintiffs reallege paragraphs 1 through 54.

56. As alleged above, Defendant City of Portland's agent intentionally engaged in harmful and offensive contact with Mr. Johnson.

57.     This intentional conduct harmed and killed Mr. Johnson.

58.     Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

**Count 2: Wrongful Death**

59.     Plaintiffs reallege paragraphs 1 through 58.

60.     As alleged above, because the City of Portland failed to train and discipline its officers, including Defendant Ajir, in following directives, as described above, it was foreseeable that Defendant Ajir would engage in an unreasonable foot pursuit that would end in Mr. Johnson's death.

61.     Failing to train and discipline its officers is unreasonable given the grave risk of severe harm to the public, and to Mr. Johnson.

62.     Defendant Ajir's conduct in engaging in a foot pursuit given the potential for harm against the public was unreasonable. Had Defendant Ajir followed directives concerning when and how to properly conduct, or not conduct, a foot chase, Mr. Johnson would be alive today. It was foreseeable that in not radioing BOEC, not utilizing cover or back up, not maintaining a safe distance from Mr. Johnson, in attempting to overtake Mr. Johnson, in stepping backwards after getting too close to Mr. Johnson to use less-lethal weapons, in unreasonably believing Mr. Johnson was giving up, in ignoring the availability of alternative methods to take the plaintiff into custody as outlined by PPB directives, by failing to deescalate a circumstance where Mr. Johnson was clearly demonstrating signs of mental illness and distress, by creating the very circumstance that lead to his firing of three bullets into Mr. Johnson, and in relying on a gun when only faced with a boxcutter, it would result in the type of harm Mr. Johnson suffered.

63.     Defendant City is liable for Defendant Ajir's conduct.

64.     Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

## REASONABLE ATTORNEY'S FEES AND COSTS

65.     42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

66.     Plaintiffs requests that the Court grant a reasonable attorney's fee in this action.

## DEMAND FOR JURY TRIAL

67.     For all claims alleged in this Complaint, Plaintiffs demands a jury trial.

## CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

    A.     For economic and non-economic damages in an amount to be determined at trial;

    B.     For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

    C.     Such other relief as the court deems just and proper.

DATE:  May 10, 2019.

/s/ *Juan C. Chavez*  
Juan C. Chavez, OSB #136428  
Of Attorneys for Plaintiff  
*LEAD ATTORNEY*

/s/ *Alex Meggitt*  
Alex Meggitt, OSB #174131  
Attorney for Plaintiff

Oregon Justice Resource Center